## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

TIMOTHY CHRISTOPHER MIKESELL,

     Plaintiff,

v.                                                                         Civ. No. 15-1026 GJF

NANCY BERRYHILL, *Acting Commissioner of the Social Security Administration*,

     Defendant.

## ORDER

THIS MATTER is before the Court on Plaintiff's "Motion to Reverse and Remand for a Rehearing With Supporting Memorandum" ("Motion"), filed on August 16, 2016. ECF No. 22. The Commissioner responded on October 21, 2016. ECF No. 26. Plaintiff replied on November 11, 2016. ECF No. 27. Having meticulously reviewed the entire record and the parties' pleadings, the Court finds that Plaintiff's Motion is not well taken and that the Administrative Law Judge's ("ALJ's") ruling should be **AFFIRMED**. Therefore, and for the further reasons articulated below, the Court will **DENY** Plaintiff's Motion.

## I.  BACKGROUND

Plaintiff was born on January 3, 1966, in Carlsbad, New Mexico. Administrative R. ("AR") 194-95. He attended Sandia High School in Albuquerque, but did not graduate. In 1984, Plaintiff took the General Educational Development ("GED") test, and passed. AR 245. Additionally, he received specialized training as a massage therapist in 1994 and obtained a commercial driver's license ("CDL") in 2007. AR 245. From 1985 to 2010, he held semi-continuous employment in numerous positions, to include security guard, warehouse helper, laborer, telemarketer, and restaurant server. AR 236, 261. After being laid off from his last

place of employment in approximately June 2012, he continued to look for work in both 2012 and 2013 as either a truck driver or warehouse helper.  AR 55.

Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 4, 2013, and September 9, 2013, respectively.  AR 31. Plaintiff claimed disability beginning on June 1, 2012, based on post-traumatic stress disorder ("PTSD"), bipolar disorder, depression, anxiety, high blood pressure, shoulder problems, depression, and anxiety.  AR 244.  The Social Security Administration ("SSA") denied Plaintiff's application initially on November 22, 2013, and upon reconsideration on January 30, 2014.  AR 105, 123.  At his request, Plaintiff received a *de novo* hearing before ALJ Ann Farris on January 7, 2015, at which Plaintiff, his attorney, and a vocational expert ("VE") appeared. AR 49-83.  On February 24, 2015, the ALJ issued her decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act").  AR 31-43.  Plaintiff appealed to the SSA Appeals Council, but it declined review on September 16, 2015.  AR 1-3. As a consequence, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 422.210(a) (2016).

Plaintiff timely filed his appeal with the U.S. District Court on November 11, 2015.  ECF No. 1.

## II.    PLAINTIFF'S CLAIMS

Plaintiff advances three grounds for relief.  First, he argues that the ALJ failed to appropriately weigh the opinion of treating psychologist Dr. Lynn Thompson, Ph.D.  Pl.'s Mot. 14-17, ECF No. 22.  Second, he contends the ALJ failed to incorporate certain moderate limitations identified by Dr. Scott Walker, M.D., into Plaintiff's ultimate residual functional

capacity ("RFC") assessment.  *Id.* at 18-19.  Third, he alleges that the ALJ's credibility finding is unsupported by substantial evidence.  *Id.* at 19-24.

## III.    APPLICABLE LAW

### A.  Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[1]  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.").

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Langley*, 373 F.3d

---

[1] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2017); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court examines "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

### B.  Sequential Evaluation Process

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2017). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App. 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's RFC. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant bears the burden of proof on

the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his past work, then the Commissioner bears the burden at the fifth step of showing that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.    THE ALJ'S DECISION

The ALJ issued her decision on February 24, 2015. AR 43. At step one, she found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 1, 2012. AR 33. At step two, the ALJ found that Plaintiff suffered from the following severe impairments: (1) peripheral vascular (arterial) disease on anticoagulation therapy; (2) Klinefelter syndrome;[2] (3) obesity; (4) bipolar disorder; and (5) anxiety. AR 33. In tandem with these findings, the ALJ also found Plaintiff's mild intention tremor, peripheral neuropathy, and high blood pressure to be non-severe. AR 34.

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 34-37. She premised this finding on multiple, discrete examinations of both Plaintiff's physical and mental conditions. Furthermore, each review incorporated

---

[2] Klinefelter syndrome is a genetic condition that results when a male child is born with an extra copy of the X chromosome. Klinefelter syndrome may adversely affect testicular growth, resulting in smaller than normal testicles, which can lead to lower production of testosterone. The syndrome may also cause reduced muscle mass, reduced body and facial hair, and enlarged breast tissue. The effects of Klinefelter syndrome vary, and not everyone has the same signs and symptoms. http://www.mayoclinic.org/diseases-conditions/klinefelter-syndrome/home/ovc-20233185 (last visited Feb. 6, 2017).

Plaintiff's subjective statements regarding his condition, objective medical reports, and opinion evidence.

The ALJ first turned to physical impairments, finding that Plaintiff's peripheral vascular disease did not meet or equal the severity of Listing 4.11 (chronic venous insufficiency),[3] as he had demonstrated none of the aggravating factors that would qualify him for the Listing.  AR 34. She found the same condition also failed to qualify under Listing 4.12 (peripheral arterial disease),[4] as Plaintiff again failed to establish any of the additional criteria necessary to satisfy the Listing.  AR 34.  The ALJ then considered whether Plaintiff's obesity rendered him disabled under Social Security Ruling ("SSR") 02-01p,[5] and ultimately found it did not.  She reasoned that "[u]pon reviewing the evidence . . . the claimant's obesity, alone or in combination with his other impairments, fails to meet or medically equal a listed impairment."  AR 35.  Lastly, the ALJ considered Plaintiff's Klinefelter syndrome under Listing 9.00 (endocrine disorders),[6]

---

[3] To meet the requirements of Listing 4.11, a claimant must establish both a chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following:
> A. Extensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip, or
> B. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 4.11 (2017).

[4] To meet the requirements of Listing 4.12, a claimant must establish both peripheral arterial disease, as determined by appropriate medically acceptable imaging, causing intermittent claudication and one of the following:
> A. Resting ankle/brachial systolic blood pressure ratio of less than 0.50;
> B. Decrease in systolic blood pressure at the ankle on exercise of 50 percent or more of pre-exercise level and requiring 10 minutes or more to return to pre-exercise level;
> C. Resting toe systolic pressure of less than 30 mm Hg ; or
> D. Resting toe/brachial systolic pressure ratio of less than 0.40.

*Id.* § 4.12.

[5] Obesity is considered severe "when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-1p, 2002 WL 34686281, at *4 (Sept. 12, 2002).

[6] An endocrine disorder is a medical condition that causes a hormonal imbalance.  The SSA evaluates impairments that result from endocrine disorders under the relevant listings for other body symptoms.  For example, a claimant with an adrenal gland disorder (a type of endocrine disorder) could experience effects on his bone calcium levels,

which in turn, required her to examine the condition under Listing 10.00 (congenital disorders that affect multiple body systems).[7]  AR 35; *see supra* note 6 and accompanying text.  In accordance with Listing 10.00, the ALJ considered Plaintiff's symptoms under "the other sections," and she found that they "did not meet any of them."  AR 35.

Following her examination of Plaintiff's physical impairments, the ALJ considered whether Plaintiff's mental conditions met any of the relevant Listings.  Specifically, she identified Listings 12.04 (affective disorders) and 12.06 (anxiety/obsessive-compulsive disorders) for analysis, and subsequently determined the paragraph B criteria of these Listings[8] were not met "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  AR 36.  She then explained her reasoning regarding paragraph B's four subparts.

---

blood pressure, metabolism, or mental status.  For those claimants with adrenal-related osteoporosis that compromises the ability to walk or use the upper extremities, the SSA would evaluate the condition under Listing 1.00 (musculoskeletal system), whereas if the adrenal disorder caused kidney failure, the SSA would evaluate the impairment under 6.00 (genitourinary disorders).  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 9.00.  Here, the ALJ considered Plaintiff's Klinefelter syndrome, which creates a hormonal imbalance affecting multiple systems in the body, *see supra* note 2, under Listing 10.00 (congenital disorders that affect multiple body systems).  AR 35.

[7] Listing 10.00 primarily provides guidance on how the SSA evaluates disability related to non-mosaic Down syndrome.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 10.00(B).  Additionally, the Listing recognizes that for Klinefelter syndrome and other chromosomal disorders, "the degree of deviation, interruption, or interference, as well as the resulting functional limitations and the progression may affect different body systems."  *Id.* § 10.00(D)(2).  Therefore, Listing 10.00 calls on adjudicators to consider the symptoms of such congenital disorders under "the appropriate affected body systems."  *Id.* § 10.00(D)(3).

[8] Paragraph B of Listings 12.04 and 12.06 (which is identical in both) describes impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations must be the result of the mental disorder described in the diagnostic description.  To meet either of these two Listings, a claimant must exhibit at least two of the following:
      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

*Id.* §§ 12.04(B), 12.06(B) (2016).

First, the ALJ evaluated Plaintiff's activities of daily living and found him to have only a mild restriction.   Among other things, the ALJ observed that Plaintiff "worshiped with his parents each morning, did chores, walked, watched television, cared for pets, played cards with his parents[,] vacuumed, dusted, cleaned the windows, and ironed a few times a week."  AR 35 (citing AR 282, 284, 286).  Additionally, she noted that "clinicians generally noted that he was well groomed."  AR 35.

Second, the ALJ catalogued the dichotomy in Plaintiff's social functioning, noting on the one hand that he "spent time with others talking on the phone and attended church on a regular basis," "was very respectful to authority figures and understood their authority," and "socialized with his parents on a daily basis," while on the other, Plaintiff reported "he was fired from a brewery because he was inappropriate with customers and started fights," that "at times he believed he had the right to kill or beat someone up for bad behavior," and that "he had been fired due to problems getting along with others and explained that he did not know what was acceptable behavior."  AR 35.  The ALJ accounted for these seeming contradictions by finding a "moderate limitation[ ] with respect to social functioning."  AR 36.

Third, the ALJ found that Plaintiff had moderate difficulties with concentration, persistence, and pace.  Here again, the ALJ discerned contradictions in Plaintiff's testimony.  By his own reporting, Plaintiff "could pay bills, count change, handle a savings account, and use a check book/money order."  AR 36 (citing AR 285).  Yet, "he also noted he had spending problems."  AR 36 (citing AR 286).  The ALJ found Plaintiff's "alleged spending problems [to be] inconsistent with his testimony that he grocery shopped and was responsible for his parent[s'] bills and budget."[9]  AR 36.  Similarly, the ALJ contrasted Plaintiff's self-reported

---

[9] At his hearing, Plaintiff testified in relevant part:

8

abilities to "pay attention for one to three hours" and "follow simple and clear instructions" with his later claim, propounded upon appeal, "that he lost track of what needed to be done."  AR 36 (citing AR 306).  Looking to the record, the ALJ observed that in "September 2013, clinicians noted that [Plaintiff's] comprehension appeared good, and his memory and problem solving and logical reasoning abilities appeared intact."  AR 36 (citing AR 443).  These discrepancies, coupled with Plaintiff's testimony that "he was able to play card games with his parents[,] was able to sit and watch a movie, and enjoyed doing some reading on the internet," persuaded the ALJ to find only moderate - rather than marked - limitations in this area.  AR 36.

The ALJ concluded her paragraph B discussion by finding "the claimant has experienced no episodes of decompensation, which have been of extended duration."  AR 36.  Although Plaintiff had experienced an emergency psychiatric hospitalization, the ALJ detailed that "his only episode during the alleged period of disability was in September 2013, when he was hospitalized for six days after an overdose of his medication."  AR 36.  This episode, which followed closely on the heels of Plaintiff "having a very upsetting conversation with his ex-wife," AR 36, was not of sufficient intensity or duration to satisfy the requirements of paragraph B, and as such, the ALJ proceeded to consider the paragraph C criteria.

Unlike the paragraph B criteria of Listing 12.04 and 12.06, the paragraph C sections of these two Listings differ,[10] and thus, the ALJ made two separate findings.  As to Listing 12.04,

---

With my mother, I take care of the budget because numbers and her don't agree anymore. Because she is also getting of the age where she's no longer able to drive, I do most of the grocery shopping, and I take care of the paying all the bills and all of that.

AR 59.

[10] Paragraph C of Listing 12.04 describes impairment-related functional limitations that are incompatible with the ability to do any gainful activity.  It requires a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

the ALJ found that Plaintiff "does not meet any of the C criteria because he has not had any extended duration episodes of decompensation, he does not have a residual disease process with very marginal adjustment, and he is able to function outside a highly supportive living arrangement."  AR 37.  Regarding Listing 12.06, she concluded Plaintiff "does not meet this criteria because he is able to function independently outside the home." AR 37.

Because none of Plaintiff's impairments satisfied an applicable Listing, the ALJ moved on to step four and assessed Plaintiff's RFC.  AR 37-42.  "After careful consideration of the entire record," the ALJ determined that "[Plaintiff] has the residual functional capacity to perform light work" with the following limitations:

> He should avoid hazardous conditions including sharp objects or anything that might cut him.  He can make simple workplace decisions with few workplace changes.  He should not be required to interact with the general public and should have only occasional and superficial interactions with coworkers.  Light work generally involves standing or walking up to 6 hours per day with normal breaks; sitting up to 6 hours per day with normal breaks; and lifting up to 10 pounds frequently and 20 pounds occasionally.

AR 37.

To develop Plaintiff's RFC, the ALJ relied on two principal grounds.  First, the ALJ rendered an adverse credibility finding against Plaintiff, opining that while Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms . . . [his]

---

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Paragraph C of Listing 12.06 also describes impairment-related functional limitations that are incompatible with the ability to do any gainful activity, but it requires a claimant to be diagnosed with a mental disorder "resulting in complete inability to function independently outside the area of one's home."   20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, §§ 12.04(C), 12.06(C).

statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible." AR 38.  She introduced this section by referencing Plaintiff's own statements, including his claim "that he was unable to perform jobs that required physical labor because he became fatigued and short of breath," and his allegation of "difficulty getting along with others and anxiety around people and crowds."  AR 38.  Based on the ALJ's review of the record, she took exception to Plaintiff's claims, finding that the "activities referenced in his treatment records suggest that his condition was less limiting than alleged."  AR 38.  She cited to numerous examples in the record, including, *inter alia*:

(1) June/July 2012 - Plaintiff reported he was looking for a job;
(2) August 2012 – Plaintiff reported he had been spending time with a sick family member and going to the bar with his cousin;
(3) October/November 2012 – Plaintiff reported he had taken his father to medical appointments;
(4) December 2012 – Plaintiff reported to physician's assistant Heather Drager that he felt capable of holding a job;
(5) July 2013 – Plaintiff reported he was monitoring his father's medication;
(6) September 2013 – Plaintiff reported he was able to go out and give the word of God;
(7) October 2013 – While psychiatrically hospitalized, Plaintiff attended group therapy, was appropriate with his peers and other patients, spent time in the common rooms and also attended all meals, and appeared pleasant and easy to talk to;
(8) January 2014 – Plaintiff attended a class sponsored by the church which taught participants how to speak in front of others, and gave a speech which he felt was a success; and
(9) October 2014 – Plaintiff reported an interest in tiny homes and stated that he had talked with nine builders about them.

AR 38-39.  Additionally, the ALJ noted that Plaintiff helped his parents "on a daily basis with budgeting, bill paying, transportation, grocery shopping at Albertsons or Costco, chores, hoeing weeds, taking out the trash, and cook[ing] meals with his mother."  AR 39.  "On a normal day," the ALJ highlighted that Plaintiff had great discussions and conversations with his mother, surfed the internet, participated in morning worship with his parents at home, played cards, studied for

11

meetings, and watched television.   AR 39.   Thus, relying on Plaintiff's own statements for support, the ALJ concluded Plaintiff "is able to perform a variety of activities despite his alleged social phobias."  AR 41.

The ALJ closed her RFC analysis by discussing the medical and non-medical opinions appearing in the record.   First, she chose to discount the opinion of Plaintiff's treating psychologist, Dr. Lynn Thompson, Ph.D.   AR 40-41.   Dr. Thompson completed a medical opinion questionnaire in October 2013, wherein she concluded that Plaintiff "would have fair to no ability to perform a variety of . . . mental abilities needed to do any job."  AR 41 (citing AR 403).  Dr. Thompson also stated that Plaintiff would be absent "more than twice a month," which would preclude him from competitive employment.  AR 41.  Although the ALJ acknowledged "that Dr. Thompson has opined that [Plaintiff] is unable to work," she noted that the SSA "has its own specific process for determining whether or not an individual is able to work."  AR 41.  She further explained, "I agree that [Plaintiff] does have mental symptoms which limit his work related abilities, and note that his mental condition waxes and wanes over time . . . often [in] relat[ion] to a lack of medication."  AR 41.  Ultimately, however, the ALJ reasoned that she had "accommodated [Plaintiff's] limitation with the assigned residual functional capacity and note that while he cannot perform all work, as discussed below, the vocational expert did find that there were other jobs that he could perform."  AR 41.

Next, the ALJ assigned great weight to non-examining consultative psychologists Dr. Scott Walker, M.D., and Dr. Renate Wewerka, Ph.D., both of whom found Plaintiff "capable of at least semi-skilled work in a work setting where interpersonal interactions were incidental."  AR 41.  Lastly, she assigned little weight to non-examining consultative physicians Dr. Mark Werner, M.D., and Barbara Abercrombie, M.D., who both opined that Plaintiff's physical

impairments were non-severe.  In the ALJ's estimation, these opinions "failed to adequately consider the impact [Plaintiff's] morbid obesity would have on his ability to work."  AR 41.[11]

At step four, the ALJ found that Plaintiff could not perform any past relevant work, as he was "now limited to light[,] unskilled work."  AR 42.  Accordingly, the ALJ proceeded to step five.  Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could perform other jobs that exist in significant numbers in the national economy.  AR 42-43.  These jobs, as described by VE Mary Weber, included routing clerk, warehouse checker, and shoe packer.  AR 43.  Finally, the ALJ found that Plaintiff had not been under a disability, as defined by the Act, during the relevant time period and denied the claim.  AR 43.

## V.   ANALYSIS

As set forth below, Plaintiff has failed to marshal sufficient support from facts or case law to establish that the ALJ applied incorrect legal standards or that her decision is unsupported by substantial evidence.  Consequently, his Motion must be denied.  The Court's reasoning as to each of Plaintiff's three claims will be discussed *seriatim*.

### A.  The ALJ Properly Evaluated the Opinion of Plaintiff's Treating Psychologist

Plaintiff begins his attack on the ALJ's decision by alleging that "ALJ Farris did **not** perform the requisite two-step analysis for weighing treating doctor opinions."  Pl.'s Mot. 15 (emphasis in original).  He explains, "[the ALJ] failed to determine whether Dr. Thompson's assessment was entitled to controlling weight by discussing whether it was supported by medically acceptable clinical and laboratory diagnostic techniques and whether it was inconsistent with other substantial evidence in the record."  *Id.* at 15-16.  "Rather," he avers, "she

---

[11]  In addition to the medical opinions in the record, Plaintiff's mother submitted a third-party function report.  The ALJ considered it and ultimately assigned it moderate weight.

collapsed the two-step inquiry into a single point, contrary to law."  *Id.* at 16 (citing *Chrismon v. Colvin*, 531 F. App'x 893 (10th Cir. 2013) (unpublished)).

In addition, Plaintiff posits that the reasons stated by the ALJ for discounting Dr. Thompson's opinion were neither specific nor legitimate.  Plaintiff argues instead that the reasoning advanced by the ALJ was conclusory and therefore legally deficient.  *Id.*  Moreover, despite recognizing that "this Court should not reweigh the evidence," *id.*, Plaintiff cites to multiple instances in the record that he believes support the medical opinion of Dr. Thompson. *See id.* at 16-17.  He concludes by asserting that the ALJ's RFC restrictions on Plaintiff's interactions with the general public, supervisors, and coworkers contradict her stated reasoning for discounting Dr. Thompson's opinion.  *See id.* at 17; *see also* AR 38-39 (the ALJ found that while Plaintiff alleged difficulty getting along with others, activities referenced in his treatment records suggested that this condition was less limiting than he claimed).

The Commissioner responds that "the ALJ permissibly gave 'little weight' to Dr. Thompson's statement because it was inconsistent with her treatment notes and the medical record, which indicated that Plaintiff had a wide variety of responsibilities and was able to interact with others."  Def.'s Resp. 11, ECF No. 26 (citing *Castellano v. Sec'y of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (noting consistency with the record as a factor to consider in evaluating a medical source opinion); *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013) (affirming the ALJ's decision to discount the treating physician's opinion based on claimant's activities of daily living)).  Further, she disputes Plaintiff's contention that the ALJ did not provide specific or legitimate reasons for rejecting Dr. Thompson's opinion.  *Id.* at 12.  While the Commissioner acknowledges that "the ALJ did not include a contemporaneous discussion of the specific evidence she relied on in giving little weight to Dr. Thompson's

opinion," she notes the ALJ "set forth a thorough summary of Dr. Thompson's treatment notes earlier in the decision," and "also relied substantially on Dr. Thompson's treatment notes when discussing Plaintiff's reported activities."   *Id.*   Thus, she avers "the ALJ appropriately considered" Dr. Thompson's medical source statement and her evaluation thereof is therefore free from legal infirmity.  *Id.*

### 1.  The treating physician rule

Under the treating physician rule, "the Commissioner will generally give greater weight to the opinions of sources of information who have treated the claimant than of those who have not." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (citing *Langley*, 373 F.3d at 1119).  *See* 20 C.F.R. § 404.1527(d)(2) (2016) (defining how the SSA uses medical source opinions, including treating sources, but reserving the final decision on residual functional capacity to the Commissioner); 20 C.F.R. § 416.927(d)(2) (2016) (same).  In analyzing whether a treating source opinion is entitled to controlling weight, the ALJ must perform a two-step process. First, the ALJ considers whether the opinion: (1) is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is consistent with the other substantial evidence in the record.  *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).  "If the answer to both these questions is 'yes,' [the ALJ] must give the opinion controlling weight." *Id.* (citation omitted).  If the opinion is deficient in either of these respects, however, it is not to be given controlling weight.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).

If the opinion is not entitled to controlling weight, "the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight."  *Pisciotta*, 500 F.3d at 1077.  This inquiry is governed by its own set of factors, which include:

     (1) the length of the treatment relationship and the frequency of examination;

     (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;

     (3) the degree to which the physician's opinion is supported by relevant evidence;

     (4) consistency between the opinion and the record as a whole;

     (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and

     (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (quotation omitted). While an ALJ must consider these factors, she need not expressly discuss each of them in her opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *5 (Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case."). Rather, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330 (citing *Watkins,* 350 F.3d at 1300–01). Furthermore, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham*, 509 F.3d at 1258. If this is not done, a remand is required. *Watkins*, 350 F.3d at 1300.

### 2.   The ALJ did not misapply the treating physician rule

Plaintiff's allegation that the ALJ improperly applied the treating physician rule is premised on multiple misinterpretations.  Chief among these is Plaintiff's misconstruction of the sequential evaluation an ALJ must follow when evaluating a treating physician's opinion, which he misconstrues as containing three steps.  *See* Pl.'s Mot. 15-16.  Although he does not overtly characterize the analysis as tripartite, he attempts to argue that the two parts of *step one* are in fact two distinct components of the analysis.  In his words:

> ALJ Farris did not perform the requisite two-step analysis for weighing treating doctor opinions.  She failed to determine whether Dr. Thompson's assessment was entitled to controlling weight by discussing whether it was supported by medically acceptable clinical and laboratory diagnostic techniques and whether it was inconsistent with other substantial evidence in the record.  Rather she collapsed the two-step inquiry into a single point, contrary to law.

*Id.* (internal citations, quotation marks, and emphasis omitted).  *Compare with Krauser,* 638 F.3d at 1330 (providing that in the "initial determination" of the treating physician analysis, "an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record . . . [but], [i]f the opinion is deficient in either of these respects, it is not to be given controlling weight") (internal citations omitted).  By confusing the two inquiries conducted at step one of the treating physician sequential evaluation with steps one *and* two, Plaintiff has erred.  Neither governing regulations nor case law required the ALJ to make findings on both the points Plaintiff suggests.  To the contrary, binding precedent is clear that if a treating physician's opinion is *either*: (1) unsupported by medically acceptable clinical or laboratory diagnostic techniques, or (2) inconsistent with other substantial evidence in the record, the ALJ is commanded by case law to *not* accord such an opinion controlling weight.  *See Krauser*, 638 F.3d at 1130; *Pisciotta*, 500 F.3d at 1077.  Ergo, once the ALJ had found Dr. Thompson's

opinion "not consistent with [her] treatment notes and the medical record," AR 41, the only proper course for the ALJ was to assign a discounted weight to her opinion.

Furthermore, despite Plaintiff's claims to the contrary, the ALJ properly performed the sequential evaluation required of Dr. Thompson's opinion.  At the initial stage, the ALJ found Dr. Thompson's opinion "not consistent with [her] treatment notes and the medical record."  AR 41.  Having made that finding, she proceeded to step two, where she was required to "consider whether the opinion should be rejected altogether or assigned some lesser weight."  *Pisciotta*, 500 F.3d at 1077.  At this latter step, the ALJ elected to assign "little weight" to Dr. Thompson's opinion.  AR 41.

Plaintiff contends that at this second stage, the ALJ again erred by neglecting to provide specific, legitimate reasons for discounting Dr. Thompson's opinion.  Pl.'s Mot. 16.  But again, Plaintiff misunderstands the ALJ's responsibilities.  As part of determining what lesser weight to assign to Dr. Thompson's opinion, the ALJ was required to consider the six *Watkins* factors, *see supra* p. 16, although she was not bound to discuss each in her opinion.  *See Oldham*, 509 F.3d at 1258.   Of the six, she clearly discussed at least three, thereby complying with relevant regulations.  *See* SSR 06-3P, 2006 WL 2329939, at *5 ("Not every factor for weighing opinion evidence will apply in every case.").  First, she clearly considered the length and frequency of Dr. Thompson's treatment relationship with Plaintiff (the first *Watkins* factor), going so far as to "note a gap in treatment from March to July 2013" that conflicted with Plaintiff's testimony that he saw Dr. Thompson "on a monthly basis."  AR 42.  The ALJ also scrutinized the degree to which Dr. Thompson's opinion was supported by relevant evidence (the third *Watkins* factor), chronicling Plaintiff's treatment by her throughout 2013 and 2014, and even comparing her conclusions with those of another clinician, Samantha Shannon.  AR 41.  Through that process,

18

the ALJ discovered several factors that tended to contradict Dr. Thompson's opinion (the sixth *Watkins* factor), including Dr. Thompson's own suggestion that Plaintiff's self-reporting of symptoms might be motivated by "secondary gain."[12]  AR 40 (citing AR 362).  In fact, the ALJ noted that "[a] review of her records illustrates a shift in her thinking [with] respect to his limitations, after [Plaintiff] began expressing concern that her treatment notes had caused his benefits to be denied."  AR 40.  Additionally, Dr. Thompson's notes led the ALJ to conclude that Plaintiff "does have mental symptoms which limit his work[-]related abilities, and note that his mental condition waxes and wanes . . . [h]owever, his decline was often related to a lack of medication."  AR 41; *see* AR 40 (detailing various instances when Plaintiff's mental condition deteriorated after he quit taking his medication, including January 2013 and December 2013, alongside periods when his affect was better, which coincided with proper administration of his medication).  Based on the above, this Court finds the ALJ's reasoning for according Dr. Thompson's opinion little weight "sufficiently specific" to make clear to this Court and subsequent reviewers the weight she assigned and the reasons for that weight.  *Oldham*, 509 F.3d at 1258.  Consequently, the Court cannot find error in the ALJ's decision to discount her opinion.

Whether the Court would have evaluated Dr. Thompson's opinion differently if it were reviewing the evidence *de novo* is not the question.  It is not the proper role of this Court to substitute its judgment for that of the ALJ.  "In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency.'"  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933

---

[12] The National Center for Biotechnology defines secondary gain as:

> [T]he advantage that occurs secondary to stated or real illness. Transition into the sick role may have some incidental secondary gains for patients. Types of secondary gain include using illness for personal advantage, exaggerating symptoms, consciously using symptoms for gain, and unconsciously presenting symptoms with no physiological basis. These symptoms may contribute to the social breakdown syndrome and the patient's choice to remain in the sick role.

https://www.ncbi.nlm.nih.gov/pubmed/10172109 (last visited Feb. 14, 2017).

F.2d 799, 800 (10th Cir. 1991)).  Rather, the Court's role is confined to determining whether the ALJ erred as a matter of law in her treatment of Dr. Thompson's opinion.  Because the Court finds no such error, and moreover, because substantial evidence exists to support the ALJ's decision, Plaintiff's first allegation of error fails.

### B.  The ALJ Did Not Improperly Omit Portions of Dr. Walker's Opinion

Next, Plaintiff argues that the ALJ failed to incorporate portions of Dr. Walker's opinion into Plaintiff's RFC without explanation, in violation of SSR 96-6p[13] and 96-8p.[14]  In his Mental Residual Functional Capacity Assessment ("MRFCA") of December 28, 2012, Dr. Walker identified moderate limitations in Plaintiff's "interacting with the public, co-workers, and supervisors," as well as "serious limitations with pace, persistence, and adapting to routine workplace changes" and "difficulty maintaining attendance and being on time."  Pl.'s Mot. 18 (citing AR 92-93).  Although Plaintiff concedes the ALJ "accounted for limitations in interacting with the public, with co-workers, and in adapting to changes," he claims the ALJ "did **not** include anything in [Plaintiff's] RFC concerning **supervisors**, attendance and punctuality, or problems with pace and persistence."  *Id.* at 18-19 (citing AR 37) (emphasis in original).  This omission, in Plaintiff's view, violates the "pick and choose" rule, which prohibits an ALJ from "pick[ing] and choos[ing] which aspects of an uncontradicted medical opinion to believe, relying

---

[13] SSR 96-6p mandates as follows:

> The opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

[14] SSR 96-8p provides, in relevant part, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

on only those parts favorable to a finding of nondisability." *Id.* at 18 (citing *Hamlin*, 365 F.3d at 1219). *See also Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.") (citations omitted).

The Commissioner responds that "Plaintiff's argument is not well founded." Def.'s Resp. 14. She concludes Plaintiff "essentially argues that the ALJ failed to incorporate Dr. Walker's assessed moderate limitations from Section I of the MRFCA." *Id.* Citing to both the Tenth Circuit and the SSA's Programs Operations Manual Systems ("POMS"), the Commissioner argues "that Section III of the MRFCA, not Section I, is for recording a medical consultant's formal mental RFC assessment, and that adjudicators are to use the Section III narrative as the RFC assessment." *Id.* (internal quotation marks omitted) (quoting *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished)). *See also* POMS DI 25020.010 B.1). Accordingly, she maintains "the ALJ permissibly considered the functional limitations described by Dr. Walker (and confirmed by Dr. Wewerka) in his conclusion, which stemmed from his findings in . . . Section I of the MRFCA." Def.'s Resp. 14.

Given Plaintiff's concessions, *see* Pl.'s Mot. 18-19, this allegation of error has narrowed. The Court need only consider whether the ALJ impermissibly failed to incorporate the following three moderate limitations identified by Dr. Walker into Plaintiff's RFC: (1) interaction with supervisors; (2) attendance and punctuality; and (3) pace and persistence. In his Section I findings, Dr. Walker did identify moderate limitations in each of these three categories. Yet, when offered the opportunity to elaborate in Section III ("MRFC – Additional Explanation"), Dr. Walker opined only that "[Plaintiff] appears capable of at least semi-skilled work but may need a work setting where interpersonal interactions are incidental to the work performed." AR 93.

21

The ALJ integrated Dr. Walker's narrative finding into Plaintiff's ultimate RFC, which provided that Plaintiff "can make simple workplace decisions with few workplace changes.  He should not be required to interact with the general public and should have only occasional and superficial interactions with coworkers."  AR 37.

Neither the ALJ's opinion nor Dr. Walker's own Section III narrative explicitly mention the three moderate limitations identified by Dr. Walker in Section I.  Nevertheless, the ALJ committed no error, as the Tenth Circuit's decision in *Smith v. Colvin* makes clear that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." 821 F.3d 1264, 1269 (10th Cir. 2016) (citing *Vigil v. Colvin* 805 F.3d 1199, 1204 (10th Cir. 2015)).  In fact, in *Smith*, the non-examining state physician assessed, *inter alia*, the *same three* "moderate limitations" at issue in the instant case in the claimant's ability to "accept instructions and respond appropriately to criticism by supervisors," "complete a normal workday and workweek without interruption for psychologically based symptoms," and "accept instructions and respond appropriately to criticism from supervisors." *Id.* at 1268.  But, in her RFC narrative, she too omitted these limitations and recommended instead that the claimant "could (1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged."  *Id.*  The ALJ adopted the recommendation, and found that the claimant "(1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks."  *Id.* at 1269. "Through these findings," the Tenth Circuit held that "the [ALJ] incorporated the functional limitations of [the claimant's] moderate nonexertional limitations."  *Id.*  The *Smith* court reasoned that the "notations of moderate limitations served only to aid [the physician's] assessment of residual functional capacity."  *Id.* at 1269, n2.  Correspondingly, the Tenth Circuit

explained that the court's function is not to compare the ALJ's findings to a physician's "notations of moderate limitations," but rather, to compare the ALJ's findings to the physician's opinion.  *Id.*

Under the precedent of *Smith v. Colvin*, the ALJ's RFC finding in the present case accounts for the moderate limitations identified by Dr. Walker and thereafter reduced to his Section III RFC opinion.  Therefore, the Court must also reject this claim.

### C.  The ALJ's Credibility Finding Is Supported by Substantial Evidence

In his last claim, Plaintiff asserts that the ALJ "grossly mischaracterized [Plaintiff's] daily activities in order to discredit his allegations regarding the limiting extent of his impairments."  Pl.'s Mot. 22.  Plaintiff supports this position by reciting seven remarks made by the ALJ about Plaintiff's activities of daily living ("ADLs"), and then highlighting other portions of the record which he believes undercut each of these observations, and thereby, the ALJ's credibility finding.  *Id.* at 21-23.  Additionally, he cites to *Krauser v. Astrue* for the proposition that "[i]f the 'specific facts behind the generalities' regarding the claimant's alleged minimal activities of daily living 'paint a very different picture' than the one painted by the ALJ, reversal is appropriate."  *Id.* at 24 (emphasis omitted) (quoting *Krauser*, 638 F.3d at 1332).  "Given the consistency between [Plaintiff's] alleged symptoms, testimony, and the medical record," Plaintiff concludes the ALJ should have "credited his described functional limitations in her RFC determination."  *Id.*

The Commissioner replies that "[t]he ALJ reasonably found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the record as a whole."  Def.'s Resp. 4.  Like Plaintiff, she too turns to the record, which she posits "[does] not corroborate the alleged severity of Plaintiff's symptoms."  *Id.* at 5.  Through

numerous citations to the record, the Commissioner documents evidence that contravenes Plaintiff's allegations regarding the severity of symptoms associated with his vascular disorder, Klinefelter's syndrome, and mental health. *See id.* at 5-7.[15] As part of that account, she also emphasizes Dr. Thompson's observation "that Plaintiff had poor motivation to help himself, and suggested that secondary gain was a reason for his lack of motivation." *Id.* at 6 (citing AR 362). Additionally, the Commissioner highlights various ADLs identified by the ALJ that also support Plaintiff's adverse credibility determination. *See id.* at 8-10. In sum, she argues "the ALJ's evaluation of Plaintiff's statements regarding his symptoms was 'closely and affirmatively linked to substantial record evidence' and should be affirmed." *Id.* at 10 (quoting *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009)).

### 1. Credibility evaluation standard

Before March 2016,[16] ALJs were required to consider the credibility of a claimant's subjective testimony about pain and other symptoms, and their effect on the claimant's ability to work, in crafting an RFC determination. *See Madron v. Astrue*, 311 F. App'x 170, 175 (10th Cir. Feb. 11, 2009) (unpublished) (citing SSR 96-7p, 1996 WL 374186, at *6 (July 2, 1996) (*superseded* by SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016)). [17] Precedent provided that "[c]redibility determinations are peculiarly the province of the finder of fact . . . [but],

---

[15] Although the vast majority of these citations also appear in the ALJ's opinion, some do not. Plaintiff states as much in his Reply, and accurately notes that *post hoc* efforts to rationalize an ALJ's opinion exceed the role of this Court on appellate review. Pl.'s Reply 2 (citing *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir 2004)). This Court remains cognizant of its institutional role during the judicial review process, and will not incorporate into this ruling any *post hoc* rationalizations not deriving from the ALJ's opinion. *See Allen*, 357 F.3d at 1142.

[16] At the time of her decision, SSR 96-7p required that the ALJ assess the credibility of Plaintiff's statements about his symptoms. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7 has since been superseded by SSR 16-3p, which no longer requires a credibility assessment. *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016) ("[W]e are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.").

[17] *See supra* note 15.

findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (citation and internal quotation marks omitted)).  Furthermore, reviewing courts were not to "upset such determinations when supported by substantial evidence." *Id.*

Under the pre-2016 framework, SSR 96-7p set out the proper two-step analysis of a claimant's subjective testimony.  *See* SSR 96-7p, 1996 WL 374186, at *2.  Under SSR 96-7p, the ALJ was tasked with considering whether there existed "an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." *Id.*  Second, where the ALJ found such an underlying physical or mental impairment(s), she was then required to "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.*  In doing so, the ALJ could make a finding on the credibility of a claimant's statements regarding his symptoms based on the entire case record. *Id.*

Alongside SSR 96-7p, the Code of Federal Regulations also provided criteria, in addition to the medical evidence in the record, to assist an ALJ in determining whether a claimant's statements of his symptoms were credible.  20 C.F.R. § 404.1529(c) (2016).[18]  These "credibility factors" included:

> (i) a claimant's daily activities; (ii) the location, duration, frequency, and intensity of a claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (v) treatment, other than medication, received for relief of those symptoms; (vi) any measures taken to relieve the pain or other symptoms; and (vii) other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

---

[18] The text of 20 C.F.R. § 1529 has also been amended, with alterations to take effect March 27, 2017.  20 C.F.R. § 404.1529(c) (2017) (effective Mar. 27, 2017).

*Id.* § 404.1529(c)(3).   Case law also provided that no formal factor-by-factor review of the evidence was required.  *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  "So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility," the credibility determination is to be considered adequately supported.  *Id.*

## 2.  The ALJ's credibility finding is adequately supported

Stated plainly, the ALJ's credibility findings in this case are susceptible to interpretation in either party's favor.  For her part, the Commissioner properly highlights the various parts of the record and the ALJ's opinion that underpin an adverse credibility finding.  Furthermore, as did the ALJ, this Court cannot ignore Dr. Thompson's own suspicions that Plaintiff could be motivated by secondary gain in his reporting of symptoms and motivation to improve his situation.  *See* AR 40 (citing AR 362).  Plaintiff's disregard for taking his medication, along with its concomitant degradation of his condition, was properly considered by the ALJ and also weighs against him.  *See* AR 41 ("I agree that [Plaintiff] does have mental symptoms which limit his work[-]related abilities, and note that his mental condition waxes and wanes over time . . . often [in] relat[ion] to a lack of medication.").  Lastly, the Court cannot find fault with the ALJ's assessment that Plaintiff's testimony, in many ways, conflicted with his self-reported ADLs.  *See* AR 36.  Each of these factors supports an adverse credibility determination.  *See* 20 C.F.R. § 404.1529(c).

Yet, this is not to say that the ALJ's interpretation communicates a complete account of Plaintiff's condition.  Although the ALJ noted that Plaintiff's mental symptoms limited his work-related abilities, she did not incorporate each of the troubling facts - recounted by Plaintiff in his Motion – that communicate the full contours of Plaintiff's mental condition.  *See* Pl.'s Mot 22-24.

26

To do so, however, is not required of the ALJ.  The ALJ's role is to "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *2.  This she did, and based on the entire case record, she made a credibility finding adverse to Plaintiff.  Moreover, in making the determination, she set forth the specific evidence she relied on in evaluating the Plaintiff's credibility.  *See* AR 38-41.  *See also supra* pp. 10-12; *Qualls*, 206 F.3d at 1372.  This Court finds said evidence to be "closely and affirmatively linked to substantial record evidence." *Wall*, 561 F.3d 1070.  Although the record on this issue is susceptible to interpretation in either party's favor, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084.  Therefore, remaining faithful to its standard of review, this Court cannot find reversible error in the ALJ's credibility determination. This claim, therefore, must also fail.

## VI.    CONCLUSION

For the reasons articulated above, the Court holds that the ALJ's decision was supported by substantial evidence and the correct legal standards were applied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum [ECF No. 22] **IS DENIED.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **AFFIRMED** and that the instant cause be **DISMISSED.**

**IT IS SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***